**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DOLLY E. FEREBEE,** *for herself and others similarly situated*, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 22-1155-KSM** |
| **NYCOLE MACKLIN, et al.,** | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**Marston, J.**                                            **November 4, 2022**

Following the impoundment and sale of her car, Plaintiff Dolly Ferebee, on behalf of herself and others similarly situated, sued the Philadelphia Parking Authority ("PPA"), Nycole Macklin, Scott A. Petri, and Dennis G. Weldon, Jr. (together with the PPA, the "PPA Defendants") and the City of Philadelphia (the "City"), Omika Barnes, and Michael Giunta (together with the City, the "City Defendants") (collectively, "Defendants").  (Doc. No. 15.)  In her Amended Complaint, Plaintiff asserts two counts:  first, she brings a 42 U.S.C. § 1983 claim against all Defendants, alleging that they violated her Fourth and Fourteenth Amendment Rights under the U.S. Constitution (Count I), and second, she seeks a declaratory judgment against the PPA and the City and asks the Court to find that Philadelphia Code section 12-2406(2) is not a valid exercise of the City's home rule authority and is unenforceable.  (*Id.* at 14–21.)  At bottom, Plaintiff alleges that Defendants demanded she pay $3,705 in past due parking tickets before releasing her vehicle, when the PPA only had the authority to collect $1,063.27, and had she known she only owed $1,063.27, she would have reclaimed her vehicle.  (*See generally id.*)

Presently before the Court are the PPA Defendants' and City Defendants' Motions to Dismiss.  (Doc. Nos. 22, 23.)  Plaintiff opposes the motions.  (Doc. No. 24.)  For the reasons that follow, the Court grants in part and denies in part the motions to dismiss.

## I.   Background[1]

Taking the allegations in the Amended Complaint in the light most favorable to Plaintiff, the relevant facts are as follows.

### A.   *Plaintiff Receives Notice that Her Vehicle Has Been Impounded*

Plaintiff owned a 2010 Dodge Grand Caravan, valued at about $7,500.  (Doc. No. 15 at ¶ 13.)  By February 2020, "five parking tickets had been issued against [Plaintiff's] Vehicle for unpaid parking violations totaling $507.00."  (*Id.* at ¶ 14.)  On February 11, 2020, the PPA impounded Plaintiff's car and towed it to a lot at 4701 Bath Street, Philadelphia, PA 19137.  (*Id.* at ¶ 15.)  The next day, Macklin—who is a manager of the towing and impoundment unit for the PPA—sent Plaintiff a notice that her vehicle had been impounded.  (*Id.* at ¶¶ 2, 16; *see also* Doc. No. 15-2.)

The notice informed Plaintiff that her vehicle had been impounded, provided the vehicle's location and information related to how to recover the vehicle, and warned that the vehicle may be auctioned if she did not recover it.  (Doc. No. 15 at ¶ 17; *see also* Doc. No. 15-2.)  The notice stated, "You may recover the vehicle as provided by [Philadelphia Code] §§ 12-2406.  To recover this vehicle, you will be required to pay all outstanding parking tickets *issued to this vehicle*.  In addition, you are liable for a towing fee of $175.00 and a storage charge of $30.63

---

[1] The Court notes that in her opposition brief, Plaintiff at times failed to cite to the Amended Complaint to support her factual assertions.  (*See* Doc. No. 24 at 9–12.)  Counsel is reminded of the Court's publicly available Policies and Procedures, which provide:  "Every factual assertion considered by the submitting party to be important to that party's position in a motion, opposing papers, or brief must be supported by citation or other specific reference to the record where the fact may be found.  Legal and record cites must be pinpoint cites."  Judge Marston's Policies & Procedures, Section II.B.

per day." (Doc. No. 15-2 at 1 (emphasis added).)  The notice did not state the amount Plaintiff owed.  (*See* Doc. No. 15 at ¶ 20 ("The notice did not state the amount of money the Parking Authority was demanding for Ms. Ferebee to retrieve her Vehicle.").)

The notice also informed Plaintiff that she was "entitled to an administrative hearing as described in Chapter 2800 of the Philadelphia Code" and that she "may do this by appearing at the Bureau of Administrative Adjudication [BAA], 913 Filbert Street, Philadelphia, PA 19107" during its listed business hours.  (Doc. No. 15-2 at 1.)  The notice explained that if Plaintiff did not recover her vehicle "within fifteen (15) days of the date of th[e] notice," the PPA would petition the Philadelphia Court of Common Pleas to sell it.  (*Id.*; *see also id.* ("Pursuant to §§ 12-2406 and President Judge General Court Regulation No. 96-1, if this vehicle is not recovered within fifteen (15) days of the date of this notice, the Philadelphia Parking Authority will petition the Philadelphia Court of Common Pleas to sell this vehicle at public auction."); *id.* ("A petition to sell this vehicle will be filed with the Court requesting leave to sell this vehicle at public auction on 03/12/2020 at the 12:00 PM[.]"); *id.* at 2 ("THIS IS THE FINAL NOTICE THAT YOU WILL RECEIVE BEFORE THE COURT ENTERS AN ORDER AUTHORI[Z]ING THE SALE OF THIS VEHICLE.  IF YOU DO NOT RECLAIM THIS VEHICLE, THE COURT OF COMMON PLEAS WILL ISSUE AN ORDER GRANTING THE PETITION AS SET FORTH ABOVE AND AUTHORIZING THE SALE OF YOUR VEHICLE AT THE PUBLIC AUCTION SET FORTH ABOVE, YOUR INTEREST WILL BE EXTINGUISHED, AND OWNERSHIP WILL VEST TO THE SUCCESSFUL BIDDER.").)

### B.  *Plaintiff Attempts to Retrieve Her Vehicle*

In the days immediately following the impoundment, Plaintiff made several trips to the 913 Filbert Street office.  (Doc. No. 15 at ¶ 24; *see also id.* at ¶ 25 ("This complaint refers to the

office at 913 Filbert Street by its address because it is unclear whether [the] people with whom Ms. Ferebee interacted at that address were employed by the [PPA] or the [BAA].").)  Plaintiff intended to pay the $507 owed for her unpaid parking tickets, along with costs, and have her vehicle released.  (*Id.* at ¶ 26.)  But, to her surprise, the personnel at the 913 Filbert Street office demanded she pay $3,705 to retrieve the vehicle.  (*Id.* at ¶ 27.)  An employee at that office provided Plaintiff with a printout of all of the unpaid tickets associated with Plaintiff's name "Dolly Ferebee," which included Plaintiff's tickets as well as tickets issued to her late mother, who was also named Dolly Ferebee.  (*Id.* at ¶ 28; *see also* Doc. No. 15-1.)  "Some of the tickets issued to [Plaintiff's] mother dated back to the 1970s when [Plaintiff] was a child and all of the tickets were issued for vehicles other than the impounded vehicle [she] was seeking to recover." (Doc. No. 15 at ¶ 29.)  None of the tickets issued to Plaintiff's mother were ever served on Plaintiff.  (*Id.* at ¶ 36.)

Plaintiff protested being held liable for tickets issued to her mother and returned to the 913 Filbert Street office several times with evidence of her mother's identity.  (*Id.* at ¶¶ 30–31.) Nonetheless, Plaintiff was repeatedly told that she had to pay the full $3,705 to retrieve her vehicle.  (*Id.* at ¶ 34; *see also id.* at ¶ 37 ("The personnel at 913 Filbert Street demanded payment from [Plaintiff] for tickets issued to vehicles other than the impounded Vehicle.").)

### C.   *February 13, 2020 Hearing*

On February 13, 2020, Ms. Barnes, a BAA officer, presided over a hearing.[2]  (*Id.* at ¶¶ 9,

---

[2] Plaintiff alleges that although she had several meetings with individuals at 913 Filbert Street, it was unclear "whether any of the meetings counted as hearings because the meetings were informal" and when she "requested records of hearings, the BAA denied having any records."  (*Id.* at ¶ 32; *see also* Doc. No. 15-3 at 3 ("Please be advised that there are no records responsive to your request.  It is not a denial of access under the [Right to Know Law] if the records requested do not exist.").)  Plaintiff was not given any records of hearings until this litigation commenced.  (Doc. No. 15 at ¶ 33.)  At that point, audio recordings of the February 13 hearing were turned over.

66.)  During the hearing, Plaintiff protested being held liable for tickets issued to her deceased mother for vehicles other than the one being impounded.  (*See* Audio Recording of Feb. 13, 2020 BAA Hearing, Part 1 ("I was trying to explain to them that's all my mother's.  We have the same name . . . This is her death certificate.  I'm Dolly E. Ferebee, not Dolly Ferebee.  I'm willing to pay my bills, just my bills, for Dolly E. Ferebee, but those Dolly Ferebee's are not mine, they're my mother's.").)  Plaintiff asked if this was going to help her and Ms. Barnes responded, "I have no idea, I'm trying to investigate."  (*Id.*)  Plaintiff explained that she went through this before in 2013.  (*See id.* ("In 2013, I went through this before.  And I told the young lady they were my mother's and her comment was if they were my mother's, I would go ahead and pay them.").)

During her review, Ms. Barnes found that, based on the Department of Motor Vehicles's ("DMV") records, Plaintiff was associated with a 16th Street address—one of the addresses listed for the vehicles with delinquent tickets—but Plaintiff maintained that she never had a car registered at the 16th Street address or lived there.  (*See* Audio Recording of Feb. 13, 2020 BAA Hearing, Part 3 ("[Ms. Barnes]:  That's how you get the 16th Street address, which has the middle initial "E.," so that is how they link you to the addresses.  [Plaintiff]:  I've never lived there. [Ms. Barnes]:  . . . that Somerset address from DMV.  [Plaintiff]:  I've never had a car registered—DMV, you mean?  [Ms. Barnes]:  The Department of Motor Vehicles.  [Plaintiff]: They have a registration of me with that?  [Ms. Barnes]:  Yeah, they have a customer detail, its all of the addresses you've ever used. . . .  [Plaintiff]:  And I've never had a car registered at 16th Street . . . And I've never even lived there.  I don't know where they got that address from. . . . [Ms. Barnes]:  You don't have to live there, you could have used it for credit.  [Plaintiff]:  I've never had a car registered there.  [Ms. Barnes]: You don't have to have a car registered, they can link you through your credit.  Maybe you used the address for something.").)

Plaintiff said she did not mind paying her debt, but asked why she had to pay someone else's debt. (*Id.*) Ms. Barnes explained that she has to pay it because according to the DMV, it is her debt. (*Id.*) Ms. Barnes told Plaintiff she needed to provide proof from the DMV as to who registered the vehicles for which she was denying liability. (Audio Recording of Feb. 13, 2020 BAA Hearing, Part 4.)

Plaintiff alleges that the hearing was meaningless because Ms. Barnes did not know that the PPA was only seeking authority to collect for the tickets that had been issued against her impounded vehicle, which together with fines and costs amounted $1,063.27, and not for tickets that had been issued against other vehicles that the PPA mistakenly believed belonged to Plaintiff. (*Id.* at ¶ 91; *see also id.* at ¶¶ 66–67 ("Barnes . . . did not know the official amount of indebtedness for which the PPA was seeking payment consisted only of tickets against Ms. Ferebee's impounded vehicle in the amount of $1,063.27. As a result, the hearing Ms. Ferebee had at the BAA before Ms. Barnes was meaningless. Ms. Ferebee and Ms. Barnes had a hearing over an amount of indebtedness the PPA was not actually seeking to collect.").)

Plaintiff alleges that Ms. Barnes did not inform her that she had 30 days to appeal Ms. Barnes's ruling to the Court of Common Pleas.[3] (*Id.* at ¶ 68.) In other words, Plaintiff did not know that she had until March 16, 2020 to appeal. (*Id.* at ¶ 71.)

### D.  The PPA Petitions to Sell Plaintiff's Vehicle

On February 24, 2020, Weldon, on behalf of the PPA, filed a petition with the Court of Common Pleas, requesting authorization to sell Plaintiff's vehicle at an auction on March 12.

---

[3] The Amended Complaint does not make clear what Ms. Barnes's ultimate ruling was but based on Plaintiff's allegations and the recordings, the Court infers that Ms. Barnes refused to release Plaintiff's impounded car in exchange for $1,063.67, the amount due for tickets against Plaintiff's impounded vehicle, together with fines and costs. And the Court infers from the recordings that Ms. Barnes directed Plaintiff to take her dispute to the DMV.

(Doc. No. 15 at ¶ 38; *see also* Doc. No. 15-4.)  Attached to the petition was a list of about 110 vehicles the PPA proposed to auction (including Plaintiff's vehicle), which indicated the amount of money owed to the PPA (i.e., the fines, fees, and costs) for each vehicle.  (Doc. No. 15 at ¶¶ 39–40.)  The list indicated that Plaintiff owed $1,064.27 for the fines and costs associated with her vehicle.  (*Id.* at ¶ 41; *see also* Doc. No. 15-4 at 24.)  In short, "the amount of indebtedness calculated by the PPA for presentation to the court of common pleas," as stated in the petition, differed from the amount the PPA and BAA "informally demanded" Plaintiff turn over when she went to 913 Filbert Street.  (*See* Doc. No. 15 at ¶ 61; *see also id.* at ¶ 62 ("Indeed, the personnel at the PPA who prepare and file the petition for authorization to sell impounded vehicles do not seem to share their official calculation of indebtedness for each vehicle with other employees of the PPA or BAA, so they are informed of the correct amount."); *id.* at ¶ 69.)

The PPA's petition was never served on Plaintiff.  (*Id.* at ¶ 58 ("At no time was the petition . . . served on Ms. Ferebee or any car owners.").)  Rather, Plaintiff only received the impoundment notice (Doc. No. 15-2), discussed *supra* Section I.A, and the order the Court of Common Pleas issued granting the petition (Doc. No. 15-6), discussed *infra* Section I.E.  (Doc. No. 15 at ¶ 44 ("Instead of being served with the petition, Ms. Ferebee was served with the impoundment notice, which was supposed to be a substitute for the petition, but the impoundment notice did not state the amount Ms. Ferebee was being asked to retrieve her vehicle, whereas the petition did."); *see also id.* at ¶ 64 ("The impoundment notice is sent to car owners as a substitute for service of the petition, but the impoundment notice is a flawed substitute because it does not state that car owners have until the date of the auction to recover their vehicles or state the official amount of indebtedness the PPA seeks authorization to collect.").)

Neither the impoundment notice nor the Court of Common Pleas's order granting the PPA's petition included the $1,063.67 figure.  In other words, Plaintiff did not know she only owed $1,063.27.  (*See id.* at ¶ 60 ("At no point in the impoundment process was Ms. Ferebee or any other car owner served with notice of the amount of indebtedness officially calculated by the PPA for presentation to the court of common pleas [sic] in the petition to authorize the sale of their vehicles.").)  Plaintiff alleges that she would have been able to pay $1,063.27 to retrieve her vehicle if she had been told that was her debt, rather than $3,705.  (*Id.* at ¶¶ 42–43; *see also id.* at ¶ 76.)

### E.  The Court Grants the PPA's Petition

The Court of Common Pleas granted the petition the same day it was filed.  (*Id.* at ¶ 53; *see also* Doc. No. 15-6 at 2–3.)  This gave the PPA the authority to auction Plaintiff's vehicle to collect $1,063.27.  (*Id.*)  The order was served on Plaintiff and other car owners, informing them that the court granted the PPA authority to auction their vehicles.  (Doc. No. 15 at ¶¶ 54, 58 ("The order . . . and the notice of the order were the only documents served on Ms. Ferebee and other car owners.").)

Plaintiff alleges that although the order states that the PPA may auction the vehicles, it does not "state that the car owners have until the date of the auction to claim their vehicles."  (*Id.* at ¶ 55; *see also id.* at ¶ 59 ("There is no way Ms. Ferebee or any other car owner would know from the order that he or she had until the date of the auction to retrieve their cars.  The order reinforces the erroneous inference from the impoundment notice that car owners only have 15 days to retrieve their vehicles, when, in fact, car owners have 30 days to retrieve their vehicles.").)  And unlike the list attached to the petition, the order did not state the official amount of indebtedness for each vehicle.  (*Id.* at ¶ 56.)  Plaintiff also alleges that the order did

"not authorize the PPA to collect ongoing fees and costs for storage of the vehicle up to the date of sale." (*Id.* at ¶ 57.)

### F.  Plaintiff's Vehicle Is Auctioned

On March 12, 2020—four days *before* Plaintiff's appeal period was set to expire—the PPA auctioned Plaintiff's vehicle. (*Id.* at ¶ 71 ("Ms. Ferebee's appeal period lasted until March 16, 2020, yet the PPA exposed Ms. Ferebee's vehicle to auction on March 12, 2020, before the appeals period expired.").)  Plaintiff's vehicle was sold for $2,800. (*Id.* at ¶ 74.)  The PPA took $1,646.77 from the proceeds of the auction to pay for the fines and costs, even though it only had the authority to collect $1,063.27. (*Id.* at ¶ 75.)

On June 16, the Court of Common Pleas entered an order confirming the sales of the vehicles at the auctions to various third party purchasers and authorizing issuance of titles in the names of the purchasers. (*Id.* at ¶ 73; *see also* Doc. No. 15-7 at 3.)

### G.  The Applicable Codes

The Pennsylvania Motor Vehicle Code preserves the City of Philadelphia's authority to regulate parking in its jurisdiction.  Section 6109(a) of the Code states that its provisions "shall not be deemed to prevent the . . . local authorities on streets or highways within their physical boundaries from the reasonable exercise of their police powers," which includes "regulating or prohibiting stopping, standing or parking."  75 Pa. Stat. & Con. Stat. § 6109(a).  In turn, Section 6109(f) of the Code provides, "Nothing contained in this section shall be deemed to prevent local authorities by ordinance or resolution of the local governing body from delegating their powers . . . to a parking authority."  *Id.* § 6109(f).  Further, the Code states, "[T]he parking authority of a city of the first class shall enforce and administer the system of on-street parking regulation in a city of the first class on behalf of the city."  *Id.* § 6109(g)(1) (emphasis added); *see also id.*

§ 6109(g)(5) (defining "administer" as "provid[ing] any services or materials necessary to enforce any ordinance or resolution enacted in order to regulate or prohibit, the stopping, standing or parking of motor vehicles" and "enforce" as the "issuance of parking violation notices or citations, the immobilization, towing and impoundment of motor vehicles and the collection of fines, penalties, costs and fees . . . for violations of any ordinance or resolution enacted in order to regulate or prohibit the stopping, standing or parking of motor vehicles").

The Philadelphia Code, in turn, delegates this authority to the PPA and outlines the local ordinances that govern parking in the City.  Pursuant to Philadelphia Code §§ 12-2804 and 2805, the PPA may issue citations for parking violations and must provide notice to the owner of the vehicle. *See, e.g.*, 12 Phila. Code § 12-2804 (explaining that a parking ticket may be served by affixing it to the vehicle in a conspicuous place and that a person has 15 days to answer from the date the ticket was served); § 12-2805 (stating that the PPA shall send a notice via first class mail to the owner of the vehicle at the address appearing on the registry of the state's department of motor vehicles, which must inform the owner of the parking violation charged, the right to contest a violation at a hearing, and penalties).

When a vehicle has three or more delinquent parking violations, the Philadelphia Code authorizes booting and impoundment under certain circumstances.  *See id.* § 12-2405(1)(c.1) ("Any vehicle may be removed, by means of towing . . . or immobilized for up to [72] hours by means of applying a boot and then towed . . . whenever any vehicle is . . . parked on a public street, has three or more delinquent parking tickets, and for which the Department or its designated agent has been unable to obtain a correct address for the owner; provided that such vehicle may be towed or booted under this subsection only after at least thirty days have passed since the issuance of the third such ticket and at least one such ticket included notice of this

provision.").  After a vehicle is impounded, notice must be given to the owner of the vehicle.
*See id.* § 12-2405(2) ("When a vehicle is towed pursuant to this Section . . . notice of removal
shall be sent within thirty (30) days . . . to the owner of record of such vehicle, indicating the
place to which such vehicle has been removed, the reason for its removal and impounding, the
applicable fees, and the possibility that the vehicle will be sold at public auction if not reclaimed
within fifteen (15) days of issuance of notice.").

Philadelphia Code § 12-2406 governs the recovery of impounded vehicles.  Section 12-
2406(2), which was amended in 2013, provides, "The owner . . . may obtain immediate release
of the vehicle by the payment in full of all delinquent parking tickets issued to any and all
vehicles registered in the name of the owner of the vehicle that is to be recovered, booting and/or
towing fee and accrued storage charges."  Alternatively, the owner may contest the amount of
the delinquencies and request an expedited hearing before the BAA, which must be held within
one day.  *See id.* § 12-2406(1) (explaining that a vehicle that has been impounded may be
recovered if the owner "demand[s] an expedited hearing before a Parking Hearing Examiner"
and that the hearing "shall be held not later than the first day, excluding Sunday, following the
demand").  If a vehicle is not reclaimed within 15 days, the vehicle may be sold at public auction
to satisfy any outstanding fines, penalties, charges, or outstanding tickets.  *Id.* § 12-2406(10).
However, before the PPA may auction off a vehicle, it must receive an order from the
Pennsylvania Court of Common Pleas permitting it to do so.  *See id.* § 12-2406(10)(b).

Last, Philadelphia County President Judge General Court Regulation ("GCR") 96-1, 26
Pa. B. 2489, issued in 1996, includes a Procedure for the Sale of Impounded or Seized Motor
Vehicles.  It provides that the City and/or the PPA may sell motor vehicles at a public auction if
certain procedures are followed, including submitting a petition to the state court "setting forth

the efforts made to notify the owners of record . . . to reclaim the vehicles . . . [and] that if the vehicles are not reclaimed they shall be sold at auction on a specific date."  26 Pa. B. 2489 at ¶ 3. After the court authorizes the vehicle to be sold, the PPA must send the owner of the vehicle notice of the auction date.  *Id.* at ¶ 4.  The auction date also must be published at least five days before auction in a Philadelphia newspaper.  *Id.*  GCR 96-1 also states, "At any time prior to the auction date, any owner of record . . . may reclaim the motor vehicle upon the payment of the fines, fees and costs assessed against the said motor vehicle, as set forth in the notice and as may be incurred thereafter."  *Id.*

### H.  Inconsistencies Between the Philadelphia Code and the GCR

The parties note that there are inconsistencies between Philadelphia Code § 12-2406 and GCR 96-1, which both relate to the procedure for recovering impounded vehicles.  (*See, e.g.*, Doc. No. 15 at ¶¶ 46–52; Doc. No. 22-1 at 9–10.)  Specifically, while GCR 96-1 states that "at any time prior to the auction date," the owner "may reclaim the motor vehicle upon the payment of the fines, fees and costs assessed against *the said motor vehicle*, as set forth in the notice," *see* 26 Pa. B. 2489 at ¶ 4 (emphasis added), Philadelphia Code § 12-2406(2) provides that to recover an impounded vehicle, an owner must make "payment in full of all delinquent parking tickets *issued to any and all vehicles registered in the name of the owner of the vehicle that is to be recovered*," 12 Phila. Code § 12-2406(2)(2) (emphasis added).

According to Plaintiff, "[a]lthough the Philadelphia City Council is supposed to have amended Philadelphia Code section 12-2406(2) in 2013 to require payment of all tickets owed on any car owned by the owner of an impounded car, [GCR] 96-1 was never revised to account for the change in the ordinance."  (Doc. No. 15 at ¶ 50.)  Plaintiff alleges "the PPA has continued to file petitions under [GCR] 96-1 as if the ordinance was never amended."  (*Id.*)  Plaintiff asserts

that Weldon, on behalf of PPA, "has filed the exact same form petition for authorization to sell Ms. Ferebee's vehicle in 2020 as he filed in 2012 before the ordinance was amended.  (*Id.* at ¶ 51.)  (*Compare* Doc. No. 15-5 (2012 petition) *with* Doc. No. 15-4 (2020 petition).)

### I.  Procedural History

On February 10, 2022, Plaintiff initiated this action in state court.  (*See generally id.*)  On March 25, 2022, the PPA Defendants, with the City Defendants' consent, removed the case to federal court.  (Doc. No. 1.)  Plaintiff moved to remand (Doc. No. 11), and the Court denied the motion (Doc. Nos. 18–19).

On May 31, 2022, Plaintiff filed an Amended Complaint.  (Doc. No. 15.)  In the Amended Complaint, Plaintiff brings a § 1983 claim against all Defendants, alleging that they violated her Fourth and Fourteenth Amendment rights by unreasonably seizing her property and denying her due process, and she also seeks a declaratory judgment that Philadelphia Code § 12-2406(2) is not a valid exercise of the City's home rule authority.  (*Id.* (Counts I–II).)

The PPA Defendants and the City Defendants move to dismiss the Amended Complaint, arguing, among other things, that Plaintiff fails to state a due process claim because she received notice and an opportunity to be heard, Plaintiff fails to state a *Monell* claim because she does not plead facts showing the PPA or City has a custom or policy of unreasonably seizing individuals' property and denying them due process, and the Amended Complaint lacks allegations as to the individual Defendants' personal involvement.  (Doc. Nos. 22, 23.)  Plaintiff opposes the motion.  (Doc. No. 24.)

## II.  Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (quotation marks and alterations omitted). Similarly, the Court "may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. Discussion

The City Defendants and PPA Defendants each move to dismiss the claims brought against the individual Defendants—Ms. Macklin, Mr. Petri, Mr. Weldon, Mr. Giunta, and Ms. Barnes—arguing that the Amended Complaint lacks allegations that those individuals were personally involved in the deprivation of Plaintiff's property, that they are entitled to qualified immunity, and that the official capacity claims are duplicative of the claims brought against the City and PPA. (Doc. No. 23-1 at 12–16; Doc. No. 22-1 at 23 n.7, 23–25.) The City Defendants argue that the Fourth Amendment claim should be dismissed because the impoundment of Plaintiff's vehicle was not an unreasonable seizure given Plaintiff's mounting unpaid parking tickets and the procedures followed, such as providing the requisite notices to Plaintiff.[4] (Doc.

---

[4] The PPA Defendants address the Fourth Amendment claim in passing, noting, "Plaintiff's summary allegation in Paragraph 87 of the Amended Complaint also refers to the Fourth Amendment, but *all* the *operative* allegations make clear that Plaintiff is focused exclusively on an alleged deprivation of her

No. 23-1 at 16–20.)  The City Defendants and PPA Defendants also move to dismiss the due

process claim, arguing that Plaintiff was provided notice (i.e., the impoundment notice and court

order) and an opportunity to be heard (i.e., the February 13, 2020 hearing).  (*Id.* at 20–24; Doc.

No. 22-1 at 14–22.)  The City also contends that the *Monell* claim must be dismissed because

Plaintiff has failed to point to any incidents outside of her own and therefore has not pleaded that

they have a custom, policy, or practice related to the deprivation of property.  (Doc. No. 23-1 at

25–26.)  Last, the City Defendants and PPA Defendants argue that the declaratory judgment

claim must be dismissed under the law of the case doctrine.   (Doc. No. 22-1 at 26–27; Doc. No.

23-1 at 26–30.)  The Court addresses Defendants' contentions below.

### A.  *Claims against the Individual Defendants*

The Court finds that Plaintiff has waived any argument that the claims against Mr.

Giunta, Ms. Macklin, Mr. Weldon, Mr. Petri, and Ms. Barnes should not be dismissed by failing

to respond to the City's arguments as to those claims in her opposition brief.  *See, e.g.*, *Bridges v.

Colvin*, 136 F. Supp. 3d 620, 630 (E.D. Pa. 2015) ("To put it simply: plaintiffs who fail to brief

their opposition to portions of motions to dismiss do so at the risk of having those parts of the

motions to dismiss granted as uncontested.  Thus, the Court did not clearly err—or err at all—in

concluding that Defendants' motion was unopposed in certain respects and granting Defendants'

motion in those respects."); *Pa. Nat'l Mut. Cas. Ins. Co. v. Tidewater Equip. Co.*, Civil No. 3:21-

CV-00551, 2022 WL 896876, at *5 (M.D. Pa. Mar. 9, 2022), *report and recommendation

adopted*, 2022 WL 891428 (M.D. Pa. Mar. 5, 2022) ("As the failure to brief an opposition to

portions of a motion to dismiss can result in a presumed waiver of that claim, we find that the

plaintiff has conceded this argument by failing to respond to it in its reply brief."); *Jacobs v.

---

property without due process."  (Doc. No. 22-1 at 14 n.5.)

*Mayorkas*, Civil Action No. 21-0165, 2021 WL 1979436, at *1 (E.D. Pa. May 18, 2021) ("As for the Acting Chief of Staff position, Plaintiff waives this claim by failing to respond to Defendant's arguments that it is untimely and unexhausted.").

For these reasons, the Court grants the City Defendants' motion to dismiss the personal and official capacity § 1983 claims against Mr. Giunta, Ms. Macklin, Mr. Weldon, Mr. Petri, and Ms. Barnes. Those claims are dismissed with prejudice. *See, e.g.*, *McCowan v. City of Philadelphia*, Civil Action No. 19-3326-KSM, 2021 WL 84013, at *14 (E.D. Pa. Jan. 11, 2021) (dismissing with prejudice § 1983 claims against an individual defendant on waiver grounds); *Jones v. Brouse*, CIVIL NO. 3:15-CV-0680, 2016 WL 1242347, at *4 (M.D. Pa. Mar. 30, 2016) ("Because plaintiff has failed to oppose the motion to dismiss, granting leave to amend would be futile.").

### B. Fourth Amendment Claim

Similarly, because Plaintiff failed to respond to the City and PPA's contention that she failed to plead a Fourth Amendment claim, the Court concludes that it is unopposed and dismisses the Fourth Amendment claim, with prejudice. *See McCowan*, 2021 WL 84013, at *14; *Jones*, 2016 WL 1242347, at *4.

### C. Due Process Claim

Because the Court has dismissed the claims against the individual Defendants, we consider only whether Plaintiff has stated a due process claim against the PPA and the City.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property without due process of law." U.S. Const. amend. XIV. "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's

protection of life, liberty, or property, and (2) the procedures available to him did not provide

due process of law." *King v. City of Philadelphia*, 654 F. App'x 107, 111 (3d Cir. 2016)

(quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006)). "The fundamental

requirement of due process is the opportunity to be heard at a meaningful time and in a

meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (cleaned up); *see also*

*Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. 2015) ("The essence of a procedural due

process claim, of course, is notice and an opportunity to be heard.").[5]

Here, Plaintiff claims that she received "meaningless" notice because the impoundment

notice did not state the correct amount of money the PPA sought to collect or inform her that she

had until the date of the auction to recover her vehicle. (Doc. No. 15 at ¶¶ 64–65, 89.) She also

alleges that the February 13, 2020 hearing was "meaningless" because Ms. Barnes did not know

the official amount of money the PPA sought to collect and told her the incorrect amount (which

she could not afford). (*See* Doc. No. 15 at ¶¶ 66–67, 91.) First, the Court finds that Plaintiff's

interpretation of what "meaningful" notice requires sweeps too broadly. Plaintiff was afforded

proper notice. Second, although a close call, the Court holds that Plaintiff has pleaded sufficient

facts showing that Defendants deprived Plaintiff of a meaningful hearing and, therefore, her

procedural due process claim survives the motion to dismiss stage.

Procedural due process does not require actual notice. *See Blessing*, 2021 WL 3418877,

at *4 (explaining that even if the plaintiff "did not receive the mailed notices sent to him until

after his vehicle was sold, he was still afforded due process because public notice," i.e.,

---

[5] "Identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

advertisement of the auction in the Philadelphia Tribune, "is sufficient").  Due process only requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Berger v. Phila. Parking Auth.*, 413 F. Supp. 3d 412, 419 (E.D. Pa. 2019) (quoting *Mullane v. Central Hanover Bank & Tr.*, 399 U.S. 306, 314 (1950)).  The impoundment notice does just that:  it informs Plaintiff that her car has been impounded, that she may recover the vehicle as provided under Philadelphia Code § 12-2406 and that she must pay all outstanding parking tickets issued to the vehicle, that she is entitled to an administrative hearing, and that a petition to sell the vehicle may be filed if the vehicle is not recovered within 15 days.  (*See* Doc. No. 15-2.)

Further, courts have held that the notice requirement is satisfied even when the notice misstates, or provides misleading, information.  *See, e.g.*, *Tate v. District of Columbia*, 627 F.3d 904, 908 (D.D.C. 2010).  In *Tate*, the plaintiff alleged that the District violated her due process rights when it told her it would auction the vehicle on June 7 but in fact did so on June 4 and "auctioned the vehicle without the requisite 45-day notice to her of the sale."  627 F.3d at 908. The District of Columbia Circuit held that the plaintiff had meaningful notice and stated that "[t]hat the District may have misstated the auction date or violated its own statutory notice requirement does not mean that it deprived [the plaintiff] of the process due under the Fifth Amendment."[6]  *Id.*

Here, Plaintiff received meaningful notice.  Plaintiff received the impoundment notice and a Court of Common Pleas order, both of which provided her notice that her vehicle would be sold absent certain conditions being met.  For example, the impoundment notice informed

---

[6] The District of Columbia Circuit noted that "[i]f the District subsequently sold [the plaintiff's] vehicle prematurely, that fact may well give rise to a common law tort under D.C. law but it did not deprive her of the only process due—namely, a timely notice and a hearing."  *Id.*

Plaintiff that to recover the vehicle she would need to pay all outstanding parking tickets issued to her vehicle, informed her that she was entitled to an administrative hearing and how to exercise that right, and explained that the PPA would petition to sell her vehicle if she did not recover it within 15 days.  (Doc. No. 15-2.)  The fact that Plaintiff attempted to exercise her right to be heard by appearing at the Filbert Street office for a hearing underscores that she received meaningful notice.  And, as *Tate* teaches, the fact that the impoundment notice and court order may have been misleading by failing to inform Plaintiff of the correct amount of money she owed, does not mean that she was denied adequate notice.

However, the Court cannot conclude, at this preliminary stage, that Plaintiff received a meaningful opportunity to be heard.  *Memphis, Light Gas & Water Division v. Craft*, 436 U.S. 1, 19 (1978) is instructive.  In *Memphis Light, Gas & Water Division*, the Supreme Court held that the plaintiffs were deprived of due process of law when they were not afforded an opportunity to be heard by the defendant utility company, which had terminated their utility service several times.  *Id.* at 4, 22.  In its analysis, the Court explained that "some administrative procedure for entertaining customer complaints prior to termination is required to afford reasonable assurance against erroneous or arbitrary withholding of essential service," emphasizing that "utility service is a necessity of modern life," as "the discontinuance of water or heating for even short periods of time may threaten health and safety."  *Id.* at 18.  And, in concluding that the plaintiffs were not afforded a meaningful opportunity to be heard, the Court emphasized they should have been given an opportunity "to present their complaint to a designated employee empowered to review disputed bills and rectify error."  *Id.* at 22; *see also id.* at 18 ("The opportunity for a meeting with a responsible employee empowered to resolve the dispute could be afforded well in advance of the scheduled date of termination.").

Here, the Court finds that although Plaintiff had an opportunity to present her objections at the February hearing before Ms. Barnes, Ms. Barnes was not a "responsible employee" within the meaning of *Memphis Light*, as the recordings and allegations in the Amended Complaint make clear that she was incapable of helping Plaintiff rectify the error surrounding the outstanding parking tickets or resolve the dispute. Rather, she refused to allow Plaintiff to recover her vehicle in exchange for the amount the PPA demanded in its notice (the outstanding parking tickets issued to *that* vehicle, along with fines and costs), and merely directed Plaintiff to the DMV. At base, the Court finds that whether BAA hearing officers are empowered with the authority to actually act related to the impoundment (instead of doing what Ms. Barnes did, which was limited to explaining the process, in turn passing off the complainant to another governmental entity, and informing the complainant she was on her own to fix the problem) is a fact issue for discovery.[7]

The cases Defendants cite in support of their position that the Philadelphia Code satisfies procedural due process requirements are distinguishable. *See, e.g.*, *King*, 654 F. App'x at 111 (rejecting the plaintiff's argument that he was denied due process because he interpreted the ordinances as permitting him to park his scooter on the sidewalk and because the defendants scheduled the hearing for a date when they knew he would be out of town); *Ke v. Phila. Parking Auth.*, 831 F. App'x 621, 622–23 (3d Cir. 2020) (affirming the district court's decision that the

---

[7] Further, Ms. Barnes was unable to resolve the dispute because she did not know the amount the PPA was actually seeking to collect from Plaintiff. Instead, she told Plaintiff that she had to pay the full amount owed on all tickets allegedly associated with her name, not just those issued against the vehicle that had been impounded. The PPA and City "should not be entitled to profit by [their] own misrepresentations." *United States v. Henderson*, 707 F.2d 853, 856 (5th Cir. 1983). The Court recognizes that the Fifth Circuit's *Henderson* opinion focused on the government's failure to provide adequate notice, as opposed to a meaningful hearing; nonetheless, we find the Fifth Circuit's rationale persuasive.

plaintiff failed to state a due process claim because he received a notice on his windshield with a number to call for information about the boot and chose not to contest the fine and underlying tickets in a hearing); *Blessing Auto Repair, Inc. v. Pa. State Police*, Civil Action No. 20-6569, 2021 WL 3418877, at *4 (E.D. Pa. Aug. 5, 2021) (granting motion to dismiss due process claim where the defendant received notice as public notice was advertised in the Philadelphia Tribune and the plaintiff alleged facts showing that he attempted to collect the proceeds of the sale of his car within one year after the auction); *Berger*, 413 F. Supp. 3d at 419 (granting motion to dismiss due process claim where the plaintiff was an attorney who "failed to exercise his rights, at least until he moved to intervene and unsuccessfully stay the sale of his car").

Accordingly, the Court denies Defendants' motions to dismiss Plaintiff's procedural due process claim to the extent it hinges on Defendants' failure to provide a meaningful hearing.

### D. *Monell*

Despite the fact that Plaintiff has stated a procedural due process claim under § 1983, the Court cannot find that Plaintiff has pleaded municipal liability under *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658 (1978) as to the City.[8]  Because Plaintiff has failed to show that the City can be held liable under *Monell*, this case must be dismissed against it.

Local governments and municipalities are considered persons under § 1983.  *Monell*, 436

---

[8] The PPA did not raise *Monell* in its motion to dismiss.  (*See* Doc. No. 22-1.)  And although the City and PPA filed a joint reply brief, the section in which they raised Plaintiff's failure to plead a *Monell* liability appears to be confined to City.  (*See* Doc. No. 25 at 11 (heading entitled "Plaintiff's Opposition Fails to Identify a City Custom or Policy"); *id.* ("[H]er opposition fails to articulate a requisite City policy or custom to support her claim.  Accordingly, her municipal liability claim against the City must be dismissed.").)  The Court notes that in her response brief, Plaintiff (seemingly believing that the PPA had raised *Monell*) stated that "the PPA is liable for misrepresenting the recovery period to Ms. Ferebee because the PPA has a policy, custom, or practice of using a misleading impoundment notice."  (*Id.* at 21.)  But, as discussed above, the Court found that the standard impoundment notice affords meaningful notice.  Therefore, PPA's liability cannot lie to the extent it is solely based on a "policy, custom, or practice of using a misleading impoundment notice."  Notwithstanding this deficiency, the Court cannot dismiss the § 1983 claim against the PPA given that the PPA failed to affirmatively raise *Monell*.

U.S. at 690.  A governmental entity, however, "may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior*."  *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013).  A governmental entity "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers" or where a constitutional deprivation was caused by a "governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels."  *Monell*, 436 U.S. at  690–91 (1978).  "A policy is made when a decisionmaker possessing the final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict."  *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (cleaned up).  "A custom is an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law."  *Id.* (cleaned up).

Plaintiff did not meaningfully address *Monell* in her response brief.  (*See* Doc. No. 24.)  Plaintiff fails to identify an unconstitutional City policy, practice, or custom, let alone address the City's argument that she "fail[ed] to plead the existence of an unconstitutional City policy or custom since her allegations are limited to her individual, unique experience."  (*See* Doc. No. 23-1 at 25).  And the only *facts* Plaintiff pleads in her Amended Complaint involve the City and PPA's conduct as it pertains to Plaintiff *in this case*; her class allegations are conclusory and largely focuses on the standard notice, which, as discussed above, the Court finds satisfies the requirements of due process.  (*See, e.g.*, Doc. No. 15 at ¶¶ 81–82, 85–86.)  The single instance in which Plaintiff was denied a meaningful hearing by Ms. Barnes, one BAA employee, does not give rise to a plausible inference that Defendants have a policy or custom of denying

individuals a meaningful post-deprivation hearing after their cars are impounded and before they are auctioned for sale. *See Guzman v. City of Newark*, Civil Action No. 20-6276, 2022 WL 1044957, at *9 (D.N.J. Apr. 7, 2022) ("Plaintiff has not adequately pled his *Monell* claims. First, he has not plausibly alleged the existence of a policy or custom that resulted in his alleged constitutional issues. The two instances in which the City allegedly wrongfully initiated criminal proceedings against Plaintiff do not give rise to a plausible claim that the City had a policy or custom of initiating and/or continuing criminal proceeding without evidence or in the face of exculpatory evidence. Nor does Plaintiff provide any other specific factual allegations supporting the existence of such a policy or custom.").

Accordingly, the Court grants the motion to dismiss the § 1983 claim against the City for failure to plead municipal liability, without prejudice and with leave to amend.[9]

### E. Declaratory Judgment

In Count II, Plaintiff seeks a declaratory judgment under 42 Pa. Stat. & Cons. Stat. § 7321 against PPA and the City. (Doc. No. 15 at ¶ 94.) Specifically, Plaintiff requests a declaratory judgment that Philadelphia Code § 12-2406(2) is not a valid exercise of the City's home rule authority "because there is no express authorization in the Pennsylvania Vehicles Code for a parking ticket issued against one vehicle to become a lien on another vehicle." (*Id.* at ¶ 95.) Citing to excerpts of this Court's June 3, 2022 Memorandum on Plaintiff's motion to remand, Defendants argue that the law of the case doctrine bars this claim. (Doc. Nos. 22-1, 23.) The Court disagrees.

---

[9] To the extent Plaintiff files an amended complaint, to properly plead *Monell* liability, she must connect the dots between the City's failure to provide a meaningful hearing and a policy, practice, or custom of the City. For example, Plaintiff should plead facts showing that all BAA hearing officers lack authority to resolve impoundment issues (instead of merely pleading facts that pertain only to Ms. Barnes) and/or facts that show that others have been denied a meaningful hearing.

"[T]he [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). "The law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (cleaned up).

In the Court's prior Memorandum, the Court held that the *Pullman* abstention doctrine was inappropriate because "special circumstances" were not present. (*See generally* Doc. No. 18.) In determining that "special circumstances" were missing from this case, the Court addressed three factors—uncertainty of state law, effect of state law on the federal constitutional claim, and interference with important state policies—in turn. (*Id.* at 9–14.) In arguing that the law of the case doctrine applies, Defendants rely on the Court's analysis of the first factor. There, we found only that "Plaintiff has not shown that there is any particular legal uncertainty underlying her federal constitutional claims" and stated that we could not "conclude that the Pennsylvania Motor Vehicle Code preempts Philadelphia Code § 12-2406(2)." (*Id.* at 10–11.) The issue of preemption is distinct from the lien issue presently raised in the declaratory judgment claim in the Amended Complaint. In fact, the Court recognized that these are distinct issues in a footnote in the Court's previous Memorandum. As the footnote explains, Plaintiff's failure to address certain aspects of her lien argument prevented the Court from ruling on it at that time: "Plaintiff appears to be arguing that the City was not expressly authorized to enact Philadelphia Code § 12-2406(2). But Plaintiff fails to connect the dots. Plaintiff does not point to any provisions in the Pennsylvania Motor Vehicle Code that 'cover' the same 'matter' as Philadelphia Code § 12-2406(2) and Plaintiff fails to address the other provisions of the

Pennsylvania Motor Vehicle Code that Defendants argued constituted 'express authorization.'" (*Id.* at 11 n.3.)  Accordingly, the Court finds that the law of the case doctrine does not apply here.

### IV.   Conclusion

For the foregoing reasons, the Court dismisses the claims against the Individual Defendants and the § 1983 Fourth Amendment claim, with prejudice.  The Court dismisses the § 1983 due process claim against the City only, for failure to allege *Monell* liability, without prejudice.[10]  The Court denies both Defendants' motions to dismiss the declaratory judgment claim.

An appropriate Order follows.

---

[10] As discussed above, *see supra* n.5, because the PPA failed to raise affirmatively raise *Monell*, at this time the claim survives as to the PPA.